# In the United States Court of Federal Claims

No. 19-149

Filed: October 11, 2019

|  |  |
|---|---|
| SANDWICH ISLES COMMUNICATIONS, INC., | ) ) ) ) |
| Plaintiff, | ) ) Lack of Subject–Matter Jurisdiction; |
| v. | ) RCFC 12(b)(1); Failure to State a Claim; ) RCFC 12(b)(6) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

*Lex R. Smith*, Kobayashi, Sugita & Goda, Honolulu, HI, counsel for plaintiff.

*Shari A. Rose*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for defendant.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

On January 1, 2019, plaintiff, Sandwich Isles Communications, Inc. ("SIC"), filed its Complaint with this Court. *See generally* Complaint (hereinafter "Compl."). Plaintiff alleges it was entitled to funding from the Universal Service Fund ("USF") and National Exchange Carriers Association ("NECA") pool for constructing and operating a telecommunications network that provides service to those living in the Hawaiian Home Lands. *Id.* at 1. Plaintiff further claims that the Federal Communications Commission ("FCC" or "Commission") breached an implied–in–fact contract; breached the duty of good faith and fair dealing; effected a taking under the Fifth Amendment; and violated federal statutes and regulations by revoking plaintiff's funding from the USF and NECA pool. *Id.* at 4–5. Plaintiff seeks monetary damages in the amount of $200 million. *Id.* at 27. On May 16, 2019, defendant filed its Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). *See generally* Defendant's Motion to Dismiss (hereinafter "Def.'s MTD"). For the following reasons, the Court grants defendant's Motion to Dismiss.

    **I.**    **Background**

Congress enacted the Communications Act of 1934 ("Act") to make "available . . . to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges[.]" 47 U.S.C. § 151. In

1996, Congress amended the Act to specify that it applies to all "rural, insular, and high-cost areas." 47 U.S.C. § 254(b)(3). The amendment further required the FCC to provide "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." *Id.* § 254(b)(5). To implement the Act, the FCC created the USF, which is administered by the Universal Service Administration Company ("USAC") and overseen by the FCC. *See* 47 C.F.R. § 54.701(a). The USF consists of four separate funds, but only the high-cost support fund, "which supports the provision of services in high-cost areas," is at issue in this case. *Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 57 (D.C. Cir. 2011).

The high-cost support fund allows eligible telecommunications carriers to serve high-cost areas by providing federal funds "only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e). State commissions determine if a telecommunications carrier is eligible for the USF. 47 U.S.C. § 214(e). However, if a carrier is not subject to the jurisdiction of the state commission, the FCC will determine its eligibility. *Id.* If no carrier is willing to service a high-cost area, the FCC or state commission may "determine which common carrier or carriers are best able to provide such service to the requesting unserved community." *Id.* Any carrier that is ordered to provide such service "shall be designated as an eligible telecommunications carrier for that community or portion thereof." *Id.* Importantly, a "common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) *shall be eligible* to receive universal service support in accordance with section 254[.]" 47 U.S.C. § 214(e) (emphasis added).

Telecommunications carriers in high-cost areas may also receive support from the NECA pool, which is a separate fund from the high-cost USF. *Sandwich Isles Commc'ns, Inc., v. FCC*, 741 F.App'x 808, 809 (D.C. Cir. 2018). NECA is "a not-for-profit organization set up by the [FCC] that provides various services for small carriers, including filing of tariffs and operating a pooling process that averages the access charges billed to long-distance carriers." *Id.*

In 1995, the Department of Hawaiian Home Lands authorized SIC to provide telecommunications services to the Hawaiian Home Lands, which previously lacked reliable and affordable telecommunications. Compl. at 11. (citing *Sandwich Isles Commc'ns, Inc.*, 13 FCC Rcd. 2407, ¶ 5 (Feb. 3, 1998) (hereinafter "1998 Order")). The Hawaiian Home Lands consist of "roughly 200,000 acres [of land] spread out over more than 70 non-contiguous parcels on six of the largest eight Hawaiian [I]slands." Sandwich Isles Commc'ns, Inc., 27 FCC Rcd. 470, n. 4 (2012). In 1997, SIC was designated as an eligible telecommunications carrier to provide service to customers in the Hawaiian Home Lands. *Sandwich Isles Commc'ns, Inc.*, 31 FCC Rcd. 12999, ¶ 16 (Dec. 5, 2016) (hereinafter "2016 Order"). On February 3, 1998, the FCC granted SIC's petition for waiver, allowing SIC to receive high-cost support funds and to participate in the NECA pool. 1998 Order ¶ 1.

In 2005, the FCC issued an order granting SIC's waiver to be treated as an incumbent local exchange carrier ("LEC") and confirmed that SIC's participation in the NECA pool and USF was necessary because of its large capital investment and the small population it was serving. *Sandwich Isles Commc'ns, Inc.*, 20 FCC Rcd. 8999, ¶ 1 (May 16, 2005) (hereinafter "2005 Order"). In that same order, the FCC concluded that continuing to waive the study area definition, thereby permitting SIC to be eligible to receive high-cost universal support funds,

2

would "not have an unacceptable adverse impact on the [USF]." 2005 Order ¶ 17.  Of note, SIC cites to 47 C.F.R. § 54.307 (emphasis added), which creates an exception in the limited circumstance where a *competitive eligible telecommunications carrier* "captures the subscriber lines of an incumbent [LEC] or serves new subscriber lines in the incumbent LEC's service area."  *Compare* Compl. at 14–15 (emphasis added), *with* 47 C.F.R. § 54.307.  The FCC expressly found that SIC should continue "to be treated as an *incumbent LEC* for purposes of receiving universal support."  2005 Order ¶ 1.  As plaintiff was deemed an incumbent LEC, § 54.307 does not apply, the applicable regulation is 47 U.S.C. § 214(e), which is discretionary.

### A. Cuts to SIC's NECA Funding for Paniolo Lease

In 2007, SIC informed NECA that it was considering a finance lease with Paniolo, LLC ("Paniolo"), to build an inter-island network.  *Sandwich Isles Commc'ns, Inc.*, 25 FCC Rcd. 13647, ¶ 5 (Sept. 29, 2010) (hereinafter "2010 Order").  Paniolo, a different corporate vehicle of SIC's parent Waimana, was created for the sole purpose of building an inter-island network which SIC would then lease.  *Compl.* at 16.  Paniolo was formed in order to create an accommodation account with which it would receive SIC's NECA payments.  *Id.*[1]  After receiving SIC's cost forecast, NECA sent SIC a letter, expressing "serious concerns about the amount of the proposed costs and requesting specific details of the proposed cable system." 2010 Order, ¶ 6.  NECA then notified SIC that the costs for the undersea cable transaction "[did] not appear to meet the standards of the 'used and useful' doctrine," and that NECA may not accept SIC's proposed costs for the tariff filing or for pool reporting.  *Id.* ¶ 6.  SIC states that despite NECA's response in the 2010 Order, NECA approved SIC's proposal for leasing a new inter-island network from Paniolo, where SIC would "include the new cable lease costs ($15 million annually) in its NECA cost submissions."  Compl. at 16.[2]

On September 29, 2010, the FCC issued the 2010 Order in which it determined that, under the "used and useful standard," SIC could not include 100% of the underwater cable lease costs in its NECA cost submissions.  *Id.* ¶ 9.  The FCC further found that because the cable was being increasingly "used for services provided outside of the NECA tariff, that associated portion of the lease costs [would] be ascertainable and [would] not be subject to inclusion in the NECA pool under the framework adopted in [the] order."  *Id.* ¶ 25.  However, the FCC allowed SIC to include 50% of the underwater cable leasing costs in SIC's future NECA cost submissions.  *Id.* ¶ 9.

---

[1]     Prior to building the new Paniolo underwater cable, SIC leased a pre-existing underwater cable from another company for $1.9 million annually.  2010 Order at ¶ 18.

[2]     SIC's claim that NECA approved SIC's proposal to include 100% of the new cable lease in its costs submissions is inconsistent with the 2010 FCC Order.  2010 Order ¶ 10 ("[A]lthough the Division granted a waiver to allow Sandwich Isles to participate in the NECA pool, it did not find that it is in the public interest to include all of the cable leasing costs in the NECA revenue requirement; at best, this decision is an initial determination that Sandwich Isles, as a small, new carrier providing service to a previously unserved area, would benefit from participation in the NECA pool as a general matter.").

On December 5, 2016, the FCC directed NECA to "discontinue payment of the disputed amounts and to cease allowing SIC to include 50 percent of the disputed lease costs of the cable lease expenses, as well as certain other expenses in its revenue requirement." Compl. at 17 (citing *In the Matter of AT&T Application for Review; Sandwich Isles Commc'ns, Inc., Petition for Declaratory Ruling*, 31 FCC Rcd. 12977, ¶ 9 (Dec. 5, 2016) (hereinafter "AT&T Order"). The FCC made this decision to cut SIC's NECA funding because "the cost and capacity of the Paniolo cable system [were] far in excess of what [was] reasonably required." AT&T 2016 Order ¶ 38. However, the FCC permitted SIC to continue receiving the $1.9 million annual leasing costs for the existing cable, the amount SIC had been receiving prior to the construction of the Paniolo cable. *Id.* ¶ 46. SIC then filed an appeal challenging the FCC's order, which the United States Court of Appeals for the District of Columbia ("D.C. Circuit") denied. *See generally Sandwich Isles Commc'ns, Inc.*, 741 F. App'x 808.

### B. Cuts to SIC's Universal Service Fund Support

In 2011, the FCC issued a new rule that capped USF high-cost support at $250 per line per month. Compl. at 18 (citing *Connect Am. Fund et al.*, 26 F.C.C. Rcd. 17663 (Nov. 18, 2011) (hereinafter "USF/ICC Transformation Order"), *petition for review denied*, *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014)). The FCC noted in the final rule that the price cap could negatively affect carriers, so it implemented a procedure that allowed affected carriers "to file a petition for waiver that clearly demonstrated that good cause exists for exempting the carrier from some or all of the reforms." *Id.* (citing USF/ICC Transformation Order ¶ 193). Accordingly, SIC filed a petition for waiver, which the FCC denied on May 10, 2013, as SIC "ha[d] certain expenses that appear[ed] grossly excessive and unreasonable." *Connect Am. Fund*, 28 F.C.C. Rcd. 6553, 6558 (May 10, 2013) (hereinafter "2013 Order"); Compl. at 19.

SIC points out that in June of 2015, the FCC cut off SIC's USF support and directed USAC to discontinue distributing any USF payments. Compl. at 19–20. SIC filed a petition with the FCC, requesting that the FCC continue making USF payments. *Id.* The FCC has yet to rule on that petition. *Id.* at 20. In 2017, SIC filed a petition for writ of mandamus at the D.C. Circuit, asking the Court to order the FCC to reinstate the USF support, which the Court denied on February 16, 2018. *Sandwich Isles Commc'ns, Inc.*, No. 17-1248, 2018 U.S. App. LEXIS 4139 (D.C. Cir. Feb. 16, 2018).

On July 13, 2015, Albert Hee, manager of SIC and its holding company, Waimana Enterprises, Inc., was convicted of violating the tax code. Compl. at 20. Specifically, Mr. Hee was found guilty of improperly categorizing certain personal expenses as business expenses from 2002 through 2012, and for failing to report personal expense payments as income. *Id.* Mr. Hee was indicted and subsequently convicted on six counts of tax fraud and one count of corruptly impeding the administration of internal revenue laws. 2016 Order ¶ 32 (2016). Between 2002 and 2012, Waimana payed $4,063,294.39 of Mr. Hee's personal expenses, which he improperly designated as business expenses. *Id.* Mr. Hee personally instructed his assistant "on how to record and categorize the personal expenses and payments in Waimana's books as business expenses incurred by Waimana or an affiliate company." *Id.* ¶ 34. Among these expenses were: (1) $90,000 for personal massages as "consulting services," and (2) reimbursements totaling "at least $119,909.19, which included $55,232.23 for family vacations to France and Switzerland in

2008, Disney World in 2010, Tahiti in 2010, and the island of Hawaii in 2011." *Id*. ¶ 39. Furthermore, Mr. Hee instructed his personal assistant, Nancy Henderson, "to use company funds to make payments towards his three children's undergraduate and graduate education expenses and directed the payments to be recorded in corporate accounts as 'educational expenses.'" *Id*. ¶ 40. Additionally, in 2018, Mr. Hee directed Waimana to purchase a $43,000 SUV and a home in California for $1.3 million using funds from Waimana and an affiliate company. *Id*.[3] Mr. Hee also instructed his personal assistant to place Mr. Hee's wife and children on the payroll and dictated their salaries and benefits. 2016 Order ¶ 41.[4] Testimony from Mr. Hee's personal assistant and his children revealed that the children received "a salary and benefits from Waimana while attending school full-time on the mainland and while employed elsewhere." *Id*. The business records reflect that Mrs. Hee and the Hee children were payed $1,680,685.92 in salary and benefits from 2002 through 2012. *Id*. At the time of his testimony Charlton Hee, Mr. Hee's son, had been working for a Hawaiian state agency for four months while he continued to receive a salary from Waimana. *Id*. ¶ 38.

On July 28, 2015, following Mr. Hee's conviction, the FCC issued an order directing USAC to suspend "high-cost funding to Sandwich Isles pending completion of further investigation and/or other ameliorative measures to ensure that any funding provided is used solely in a manner consistent with Commission rules and policies." *Id.* ¶ 43. Consistent with that order, USAC suspended SIC's USF support and audited SIC's use of USF funds from 2002 to 2015. Compl. at 21. The audit revealed that "SIC received several millions of dollars of Universal Funds that it should not have received." *Id.* The FCC also directed USAC "to determine if there were sufficient assurances that the high-cost support amounts provided on a going forward basis would be used consistent with the Commission's rules." 2016 Order ¶ 44.

Following the USAC investigation, the FCC issued an order on December 5, 2016, directing USAC to recover $27,270,390 from SIC for the USF overpayments it received from 2002 to 2015. 2016 Order ¶ 2.[5] The FCC ordered SIC "to resubmit its cost studies for costs incurred in 2013, 2014 and 2015 . . . so that USAC [could] determine the proper amount of high-cost support to Sandwich Isles for 2015, 2016 and 2017 consistent with [FCC's] findings in [that same] Order." *Id.* ¶ 148. The 2016 Order further stipulated that, after SIC resubmitted its cost studies and the FCC formally determined how SIC would reimburse the USF, the FCC would direct USAC to lift the suspension of high-cost support. *Id.* Following the FCC's guidance, the Hawaii Public Utilities Commission ("HPUC") elected not to certify SIC as eligible for future USF funding. Compl. at 20. As a result, SIC has not received funds from the USF since September 2015, as an eligibility certification is a prerequisite to receiving USF funds. *See* 47 U.S.C. §214(e)(3).

---

[3]   While enrolled in university, Mr. Hee's children, Charlton and Breanne, lived in the home and used the SUV for their personal use. 2016 Order ¶ 40.
[4]   Mr. Hee's personal assistant testified "that [Mr. Hee's wife] was in the office 'occasionally' or 'every couple of months' and saw [her] do work in the office 'one time.'" 2016 Order ¶ 41.
[5]   The amount of $27,270,390 is the total amount of improper payments. The $26,320,270 amount is the improper payments associated with the Cable and Wire Facilities Costs. 2016 Order ¶ 57.

5

On January 9, 2019, the FCC denied SIC's petition seeking a rehearing of the 2016 Order because the FCC's Order already addressed the underlying issues. *Sandwich Isles Commc'ns, Inc.*, No. 18-172, 2019 WL 105385, ¶ 4 (F.C.C. Jan. 3, 2019) (hereinafter "2019 Order on Reconsideration"). In response, SIC appealed the FCC's decision to the D.C. Circuit, which dismissed the appeal as untimely. *See generally Sandwich Isles Comm'ns Inc. v. FCC*, No. 19-1056, 2019 WL 2564087 (D.C. Cir. May 17, 2019).

### C.  SIC's Claims

SIC's allegations are based on the cumulative effect of the FCC's actions. SIC alleges that the FCC's actions injured SIC because subsequent funding "[fell] short of covering the debt-service payments and operating costs [SIC] continues to bear in order to provide telecommunications services to native Hawaiians, much less allow for returns to meet SIC's reasonable investment-backed expectations." Compl. at 22.

Count One alleges that the FCC breached an implied-in-fact contract when the FCC "drastically reduce[d] SIC's compensation." Compl. at 23. In Count Two, SIC purports that the FCC effected a taking for public use when it reduced SIC's USF and NECA funding, depriving "SIC of its reasonable, investment-backed property interests." *Id.* at 23–24. Count Three alleges that the FCC's actions violated the Communications Acts of 1934 and 1996, which require that the FCC continue providing support while SIC was required to continue providing telecommunications services. *Id.* at 25–26 (citing 47 U.S.C. § 214(e)(1)). Finally, Count Four alleges that the FCC's 2015 suspension of USF funds violated 47 C.F.R. § 54.307(a), which states the following:

> A competitive eligible telecommunications carrier shall receive universal service support to the extent that the competitive eligible telecommunications carrier captures the subscriber lines of an incumbent local exchange carrier (LEC) or serves new subscriber lines in the incumbent LEC's service area.

47 C.F.R. § 54.307(a); *see also* Compl. at 26–27.

### II.   Standard of Review

This Court's jurisdiction is primarily defined by the Tucker Act, which waives the sovereign immunity of the United States for claims not sounding in tort that are founded upon the Constitution, an Act of Congress, an executive department regulation, or an express or implied contract with the United States. *See* 28 U.S.C. § 1491(a)(1). The Tucker Act is merely a jurisdictional statute, and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of the substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in relevant part).

A complaint will be dismissed for failure to state a claim upon which relief can be granted "when the facts asserted by the claimant do not entitle [them] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1256 (Fed. Cir. 2002) (citing *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)). When deciding a motion to dismiss under RCFC 12(b)(6), the Court "must accept as true all the factual allegations in the complaint, and [the Court] must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F. 3d 1375, 1378 (Fed. Cir. 2001). To survive a motion to dismiss, the complaint must also meet the plausibility standard, which means the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, it must contain well-pleaded factual allegations "respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell*, 550 U.S. at 562. However, the Court is not obligated to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### III.   Discussion

In its Motion to Dismiss, defendant argues that the Court's jurisdiction over plaintiff's claim is preempted by the Communications Act of 1934 and the Hobbs Act, thereby displacing this Court's Tucker Act jurisdiction. *See generally* Def.'s MTD at 13–19. In determining whether a statutory scheme displaces Tucker Act jurisdiction, a court must "examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). The Communications Act of 1934 and the Hobbs Act specify the process for judicial review of FCC orders. *Id.* at 14–15. The Communications Act of 1934 states, "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in [the Hobbs Act]." 47 U.S.C. § 402(a). The Hobbs Act states in relevant part:

> The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
>
> (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

. . .

28 U.S.C. § 2342(1). Section 402(b) of title 47 lists certain FCC decisions and orders that are exclusively reviewable by the D.C. Circuit. *See* 47 U.S.C. § 402(b). Importantly, subsections 402(a) and (b) are mutually exclusive, as "[a]ppeals from all decisions of the Commission that do not fall within subsection 402(b) are encompassed by the procedures of subsection 402(a)." *Folden v. United States*, 379 F.3d 1344, 1356 (Fed. Cir. 2004). In fact, "subsections 402(a) and (b) comprise the entire statutory regime by which parties may obtain judicial review of Commission decisions." *Id*. Thus, appeals of FCC decisions and orders are limited to the

jurisdictions of the courts of appeals under subsection 402(a), or the D.C. Circuit under subsection 402(b). *Id.*

With this statutory framework in mind, the Court next must determine whether plaintiff's claims are challenges to FCC orders. Defendant contends that SIC's Complaint "plainly represents a challenge to FCC actions and orders." Def.'s MTD at 17. Plaintiff, however, argues that its claims are not challenges to FCC orders, and that

> [n]o FCC order required that SIC's [USF] support be cut to zero. No FCC order dictated that the FCC endorse SIC's construction of its network as it stands today; assist SIC in borrowing hundreds of millions of dollars to construct the network; and then (after the investment has been made) reduce the rates SIC can charge to virtually nothing.

Pl.'s Resp. at 2.

In analyzing whether subsection 402(a) applies, the Court "must look to the true nature of [plaintiff's] claim, not how plaintiff characterize[s] it." *Folden,* 379 F.3d at 1359, n.13; *see also Son Broad., Inc. v. United States*, 42 Fed. Cl. 532, 534 (1998) ("The court, however, is not required to accept plaintiff's framing of the complaint and, instead, must look to plaintiff's factual allegations to ascertain the true nature of plaintiff's claims."). Similar to the plaintiffs in *Folden*, SIC frames its claim as a "breach of contract, breach of the duty of good faith and fair dealing, Fifth Amendment taking of property without just compensation, and violation of federal statutes and regulations mandating compensation." *Compare Folden*, 379 F.3d at 1359, *with* Compl. at 2. In *Folden*, though plaintiffs framed their cause of action against the FCC as a breach of contract claim, the Federal Circuit ultimately found that plaintiffs' claim was challenging an FCC decision. *Folden* at 1359 n.13. This brings the claim under the exclusive jurisdictional purview of the D.C. Circuit pursuant to 47 U.S.C. § 402(b). *Id.*

The Federal Circuit in *Folden* also found that plaintiffs' breach of contract claim was a pretextual attack on the FCC's decision because the "true nature" of the claim targeted the FCC's procedural decisions that allegedly gave rise to plaintiffs' breach of contract claim. *Id.* ("At root, plaintiffs' action plainly represents a challenge to the Commission's failure to hold relotteries for the seven RSA licenses at issue. It is on those terms that we approach the question whether subsection 402(b) applies to it."); *cf. Shanbaum v. United States*, 1 Cl. Ct. 177, 178 (1982), *aff'd*, 723 F.2d 69 (Fed. Cir. 1983) ("plaintiffs do not challenge the validity or propriety of the FCC order concerned. Instead, plaintiffs argue that the order itself was a 'taking' . . . [so] the Claims Court has jurisdiction."). This Court has since clarified that "[r]eview of decisions ancillary to the FCC's licensing decisions and litigation that at its 'root' is a grievance against an FCC licensing determination must be brought in the D.C. Circuit." *Biltmore Forest Broad. FM, Inc. v. United States*, 80 Fed. Cl. 322, 330 (2008). It seems clear to this Court that the "true nature" of SIC's claims is focused on challenging the validity and propriety of FCC orders and actions, therefore bringing those claims under the purview of 47 U.S.C. § 402(b).

SIC points to several FCC actions to support its claims. First, SIC points to NECA funding reductions that resulted from the 2010 and 2016 FCC Orders. *See generally* Compl. In

8

2010, the FCC issued its first Order that reduced the amount SIC could include in its NECA costs submissions for the Paniolo underwater cable lease from 100% to 50%.  *See* 2010 Order at 13650.  Then, in 2016, the FCC issued its second Order, reducing the reimbursement rate from 50% to 0%, but still allowing SIC to recover $1.9 million annually, the amount it recovered from the prior underwater cable lease.  *See generally* 2016 Order.  SIC appealed the 2016 Order, but the appeal was denied.  *See generally Sandwich Isles Commc'ns*, 741 F. App'x 808.

Next, SIC objected to the FCC's May 10, 2013 denial of SIC's petition for a waiver of the $250 per line monthly cap on USF support.  *See* Compl. 18–19; *see also* 2013 Order at 6558 (2013).  Pursuant to 47 U.S.C. § 402(b) and 28 U.S.C. § 2342(1), however, only the D.C. Circuit (other than the United States Court of Appeals for the Federal Circuit) possesses jurisdiction over claims challenging the FCC's denial of this type of waiver.

Finally, SIC's challenge to the suspension of funding is currently pending before the FCC.  Compl. at 19–20.  A matter pending before the FCC does not divest the court of appeals of its exclusive jurisdiction over appeals of FCC orders.  *See Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 626 (9th Cir. 1985) ("[W]here a statute commits review of final agency action to the court of appeals, any suit seeking relief that might affect the court's future jurisdiction is subject to its exclusive review.").  The FCC addressed the USF fund suspension in the 2016 Order, where it said it would "direct USAC to lift the suspension of the Company's high-cost support" once the FCC determines "how the Company will reimburse the Fund."  2016 ¶ 148 (2016).  SIC appealed the 2016 Order, but it was dismissed as untimely.  *See generally Sandwich Isles* 2019 WL 2564087.

SIC's claims attempt to recover the funds cut by these FCC orders.  While SIC characterizes its claims as a breach of contract, breach of duty of good faith and fair dealing, Fifth Amendment taking, and statutory violation, the true nature of SIC's claims is targeted at invalidating the FCC orders.  Although SIC alleges it is not challenging the substance of the FCC orders, it is clear to the Court that plaintiff is attempting to circumvent those orders.  As such, and pursuant to 47 U.S.C. § 402(b) and 28 U.S.C. § 2342(1), only the D.C. Circuit—not the Court of Federal Claims—has jurisdiction over plaintiff's causes of action.  Thus, SIC's claims do not fall within this Court's jurisdiction and must be dismissed.

## IV.     Conclusion

For the reasons set forth above, defendant's Motion to Dismiss is **GRANTED** pursuant to Rules 12(b)(1) and 12(b)(6).  The Clerk is hereby directed to enter judgment consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge